IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA,**                    Criminal No. 09-308

**v.**

**VASILIA BERGER,**
 **a/k/a VASILIA KLIMANTIS,**

                    **Defendant.**

DEFENDANT'S MEMORANDUM
IN SUPPORT OF LOSS CALCULATION

COMES NOW the Defendant, Vasilia Berger, by and through her counsel, J. Alan
Johnson, Esquire, and Johnson & Eddy, LLC, and submits the following Defendant's
Memorandum in Support of Loss Calculation and respectfully states:

A.      FACTUAL BACKGROUND

The defendant, Vasilia Berger, owned Steel City Mortgage (hereinafter SCM)
since 1996. Ms. Berger's husband, Jay Berger, owned a similar company, First Federated
(hereinafter FF). The defendant and her husband married in 2003, after which time their
two companies merged and FF did business as SCM.

Elleni Berger is the defendant's sister. Elleni Berger owned All Credit Finance
(hereinafter ACF), a mortgage brokering company. Elleni Berger married Randy Berger
(no relation to Jay Berger) and the two of them, together, ran ACF. ACF opened in 1998.

At no time did ACF share office space, employees, profits or resources.  In fact, SCM/FF and ACF were competitors.

Kenneth Cowden was a real estate "appraiser," who operated without proper licensing to perform property appraisals.  Mr. Cowden appraised a number of properties for Ms. J. Berger and Mr. V. Berger, which appraisals the defendant used to broker mortgages.  Ms. Berger met Mr. Cowden when he was working as a realtor and accountant, though at the time they initially met, Mr. Cowden was already performing appraisals for other brokers, as well.  *See* Defense Exhibit 1.  Mr. Cowden did prepare income tax returns for the defendant and her husband, but the returns were never filed and Mr. J. Berger eventually hired another tax professional to prepare and file the returns.

## B.    LOSS VALUATION

For purposes of determining a defendant's applicable offense level for fraud-related offenses, the Court must determine the amount of loss caused by the defendant's conduct.  U.S.S.G. § 2B1.1(b).  "Loss" is defined as the greater of the actual loss incurred by the victim or the defendant's "intended" loss.  U.S.S.G. §2B1.1, app. n.3(A) (2010).  "Intended loss" is the pecuniary harm that was intended as a result of the offense and includes such harm even if it was impossible or unlikely to occur.  U.S.S.G. §2B1.1, app. n.3(A)(ii).  Actual loss, on the other hand, means the reasonably foreseeable pecuniary harm caused by the defendant's conduct.  U.S.S.G. §2B1.1, app. n.3(A)(i).

Where the court cannot reasonably determine the loss caused by the defendant's conduct, the court *shall* use the *gain* that resulted from the offense.  U.S.S.G. §2B1.1, app. n.3(B) (emphasis added).

The case law governing loss calculation for purposes of determining the defendant's offense level in mortgage fraud cases stems from *U.S. v. Siciliano*, 601 F.Supp.2d 623 (E.D.Pa. 2009) and a trilogy of Third Circuit cases (*U.S. v. Sharma*, 190 F.3d 220 (3d Cir. 1999), *U.S. v. Napier*, 273 F.3d 276 (3d Cir. 2001), *cert. denied*, 535 U.S. 1066 (2002), and *U.S. v. Anderson*, 216 Fed.Appx. 258 (3d Cir. 2007)).   In calculating loss, "[t]he court need only make a reasonable estimation of the loss," which may be based upon "available information."  U.S.S.G. §2B1.1, app. n. 3(C).

The burden of persuasion with respect to the loss calculation rests with the government by a preponderance of the evidence.  *See U.S. v. Jimenez, et al.*, 513 F.3d 62, 86 (3d. Cir. 2008) (citing *U.S. v. Napier*, 273 F.3d at 279).  "The Guidelines are clear that the loss calculation does not need to be perfectly accurate, ***though it can not be based on pure speculation***."  *U.S. v. Siciliano*, 601 F.Supp.2d 623, 626 (E.D.Pa. 2009) (emphasis added).

Before addressing the objections to the government's loss calculations, it is worth exploring the holding in *Siciliano* as, factually, it is quite similar to the instant case.  More importantly, the *Siciliano* decision was cited by the Court as the approach it intends to use in determining the loss attributable to Ms. Berger at the hearing on February 11, 2011.  In *Sicilano*, the loss calculation was based off the actual loss to the lenders.

In *Siciliano*, the defendant brokered mortgages for properties using fraudulent and inflated appraisals for one particular borrower who was a rogue "real estate developer," to use the term loosely. *Siciliano*, 601 F.Supp.2d at 624-25. At sentencing, the court undertook to determine the loss caused to the financial institutions as a result of the fraudulently procured loans. *Id.* at 626-634.

To "prove" loss in *Siciliano*, the government asserted two theories for calculating an amount. These theories, categorically, pertained to properties (1) that had gone through foreclosure and (2) properties where foreclosure had not been completed. *Id.* at 632. For properties which had been through the foreclosure process, the loss calculation was essentially as follows:

Loss = Unpaid balance of loan – resale value of property + foreclosure costs

*Id.* The court had no problem using this formula and indeed adopted it to determine the actual loss in the case.

Regarding the loss on the non-foreclosure properties, however, the government was not able to establish actual loss using hard numbers. *Id.* Instead, the government computed the "Percentage Loss" using an average of the loss per home for the foreclosed upon properties and applying the calculated average percent loss to the unpaid balance of the mortgages in Category 2. *Id.* The defense presented an expert forensic appraiser who provided a different method of calculating loss for the properties that were still pending foreclosure. *Id.* at 628-29. In light of the fact the defense introduced some evidence to rebut the government's percentage loss theory, the district court did not feel comfortable adopting a loss calculation that was a formula of averages. *Id.* at 633-34. **Because the**

4

**government had not presented evidence to substantiate its loss calculation on the Category 2 properties, the court found the loss was *only* the amount for the Category 1 properties for which the government had presented evidence**. *Id.* at 634.

Notably, in *Siciliano*, the government was able to provide the court with a starting point; that is, evidence of the unpaid balance of the loan for both categories of properties. *Id.* at 632. Despite the precise calculation of actual loss which the government provided on the Category 1 (foreclosure) properties, the extrapolation of loss to the Category 2 (non-foreclosure) properties was not permitted. *Id.* at 634.

Turning first to the roughly 79 loans brokered by First Federated and Steel City Mortgage, which have been through foreclosure according to Government's Exhibit D of the Brief In Support of Loss Amount, and excepting those loans financed by National City/PNC Bank, the defense notes the calculation of the loan amount is supported by no evidence whatsoever. The government's brief states, "the exact loan amounts for these loans are not known," but goes on to propose a *purely speculative* formula for the Court to use to try to figure it out. For convenience, the government's proposed calculation will be called the "80% algorithm." This practice is squarely in contradiction to the directive of *Siciliano* which instructs that loss calculation *not* be purely speculative.

The government urges the Court to determine the value of the loans at the time of foreclosure were 80% of Mr. Cowden's appraisal value. The defense does not dispute that 80% of an appraised value is customary in the lending industry for determining an approximate value of *an original purchase loan*. However, actual loss calculation is based upon the *unpaid balance* of the defaulted upon loan, not the value of the original

loan.  *See Sharma*, 190 F.3d at 227 (holding calculation of actual loss begins with "unpaid principal" on the loan); *see also Siciliano*, 601 F.Supp.2d at 627 (where even the government acknowledged the loss calculation began with the "principal that remains on the mortgage…").

In the case of the loans brokered by Steel City Mortgage set forth in Government's Exhibit D, which ended in default, most loans were made in the years 2001, 2002 and 2003.  Many of these properties did not go into default until 2007, 2008 or 2009. Common sense indicates the foreclosure process generally does not take more than 2 years.  Assuming, *arguendo*, that the loans in Exhibit D were original purchase loans at 80% of the appraised value, at least 4-6 years of payments must have been made on these loans to warrant foreclosure no sooner than 2007-2009.[1]  Yet the government seeks to burden the defendant with a loss calculation based upon the entire value of the original loan based upon its proposed formula.  If the values on these non-National City/PNC loans are not known, then they are not known.  If they are not known, no one – not the government, not the defense, and not the Court – ought to be guessing as to what the values might have been, particularly when common sense and knowledge of the ways of the world make the government's algorithm virtually impossible.  Defense Exhibit 2, a report which was received by the defense from the FBI, shows clearly that the government cannot prove loan balances on loans from Countrywide, Flagstar, Key Bank, and Taylor Beane.

---

[1] The defense does not concede that all of these loans were original purchase loans.  Indeed some of them were refinance loans, wherein the borrower received a loan in excess of what they owed on their original purchase loan, but in amounts that were much less than 80% of the appraised value.

In addition, absent any evidence of the principal remaining at the time of default, the defense (and this Court) has no way of knowing if 80% of the full appraisal was even financed in the first place.  If a homeowner sought a refinance of his or her home for home improvement or debt consolidation, perhaps the owner only financed 50% of the appraised value.  It is quite common in a refinancing situation for a borrower to finance a percentage of the appraised value much less than 80%.  When "the exact loan amounts for these loans are not known," absent some evidence, the defense asks that the Court not do what is proposed by the government: purely speculate as to what the values were.

In some cases, the defaulted upon loans set forth at Government Exhibit D were not even Steel City Mortgage or First Federated loans which went into default.  For example, item #6 on Government Exhibit D indicates the borrower, D. Payne, received a loan of $36,000.00 brokered First Federated.  The government has provided no evidence of the loan to Mr. Payne, however.  Rather, this loan amount is based upon the government's proposed calculation of the loan value using Mr. Cowden's appraisal value.

Indeed the amount of the loan brokered by First Federated on February 28, 2002 was $30,400.00.  *See* Defense Exhibit 3.  However, this property was refinanced on September 10, 2003 for $45,240.00 with The Citi Group, a loan which was not brokered by the defendant in this case.  America's Wholesale Lender, which loaned Mr. Payne the $30,400.00 on the loan brokered by First Federated certified satisfaction of its loan on November 7, 2003.  Accordingly, the loss to the lending institution for the loan which the defendant brokered was $0.00.  Instead, the government's "calculation" wants to saddle Ms. Berger with $38,173.00 in loss, when the evidence is directly contradictory.  This

example illustrates the importance of requiring the government to actually *prove* the loss in this case.  Just this one example is off by almost $40,000.00 to the detriment of Ms. Berger.

Similarly, the foreclosed upon loan at line 34 of Government Exhibit D was not a loan brokered by Steel City Mortgage.  The loan brokered by Steel City Mortgage was funded on October 11, 2002 and was recorded on October 18, 2002.  *See* Defense Exhibit 4.  This mortgage was satisfied on August 25, 2004 when the owner refinanced the house with a loan that was *not* brokered by Steel City Mortgage.   As a result, the lending institution which funded the Steel City Mortgage loan, Meritage Mortgage Corporation, did not suffer any financial loss as a result of the defendant's actions.   Yet the government seeks to attribute $23,500.00 in loss to her.

Among the 79 loans brokered by First Federated and Steel City Mortgage, 11 were financed by National City Mortgage and/or PNC Bank (resulting from the merger of National City and PNC).  These 11 mortgages are set forth at Government Exhibit G. Among these 11 loans are a number of notable discrepancies, or, at a minimum, amounts attributed in loss to Ms. Berger for which the defense has seen no evidence.

    a.    5098 West Harbison Road, Crafton, PA  15205 – the Marketing Loss Calculation of Realized Loss prepared by PNC Bank provides a ledger for how a loss of $36,632.84 was determined.   This "net loss" includes $88,277.58 in expenses for "Makewhole paid to prior Investor (includes expenses)," which were attributed as loss to Ms. Berger.  The defense has diligently attempted to independently ascertain what "Makewhole paid to prior Investor (including expenses)" is without any success.   This "expense" of $88,277.58 nets for Ms. Berger a loss of $36,632.84.  It goes without saying that exclusion of this amount would, in fact, have resulted in a gain to the bank of $51,644.74.   The defense acknowledges this "Makewhole paid to prior Investor" expense could be a legitimate cost to

PNC Bank as a result of this foreclosure.  However, without *evidence* to assist in determining how this figure was calculated, there is no way to know if any or all of it is, in fact, legitimate.  Without knowing if the expense was properly included in the loss calculation, the defense cannot reasonably explore evidence which might rebut the inclusion of this expense in the loss calculation.  Indeed, the same could be true of the other expenses indicated on PNC Bank's ledger provided to the government.  However, the defense is most troubled by the "Makewhole paid to prior investor" expense because, as compared to the other expenses, it seems foreign to the standard foreclosure process and the research conducted by the defense has not been helpful in educating what "Makewhole paid to prior investor" even means.

Additionally, the Department of Real Estate, Allegheny County Assessment records indicate the property was sold by the lender for $143,750.00.  *See* Defense Exhibit 5.  It appears to counsel this resale value was not credited to Ms. Berger in accordance with the *Siciliano* directive to offset the unpaid balance of the loan with the amount recouped by the lender at a foreclosure sale.

b.    2226 Hawthorne Avenue, Pittsburgh, PA  15218 – as with the previous property, the ledger at Government Exhibit 43 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation, in the amount of $14,892.54.  The defense's objections to the inclusion of this value are the same as that which was expressed, *supra*.  Likewise, the property was sold by the lender who funded the National City/PNC Bank loan, that is, Fannie Mae, for $18,200.00 at foreclosure, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.

c.    3162-3164 Brighton Road, Pittsburgh, PA  15212 – as with the previous two properties, the ledger at Government Exhibit 48 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation, in the amount of $15,259.23.  The defense's objections to the inclusion of this value are the same as that which was expressed, *supra*.  Likewise, the property was sold by National City Mortgage for $6,210.00 at foreclosure, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.

d.    417 Atlantic Avenue, McKeesport, PA  15132 – as with the previous three properties, the ledger at Government Exhibit 52 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation, in the amount of $8,154.38.  The defense's

objection to the inclusion of this value is the same as that which was expressed, *supra*. Moreover, the property appears to have been purchased by National City from Fannie Mae for $10.00 and sold at foreclosure for $15,000.00. *See* Defense Exhibit 6. The defense asserts the sale for $15,000.00 should be credited against the loss calculation in accordance with *Siciliano*.

e.      234 Painter Street, Greensburg, PA   15601 – as with all previous properties, the ledger at Government Exhibit 54 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation, in the amount of $10,669.97. The defense's objection to the inclusion of this value is the same as that which was expressed, *supra*. Additionally, National City/PNC Bank sold the property to a private buyer for $33,000.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.

f.      900 Rock Avenue, Beaver Falls, 15010 – as with all previous properties, the ledger at Government Exhibit 60 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation, in the amount of $18,054.06. The defense's objection to the inclusion of this value is the same as that which was expressed, *supra*. In addition, the owner history obtained from the Beaver County Assessment records shows the property was sold for $51,500.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger. *See* Defense Exhibit 7.

g.      1516 Chestnut Street, Connellsville, PA 15425 – the defense objects to the inclusion of the loss figure on this loan set forth at Government Exhibit G inasmuch as there is no evidence before the Court upon which to conclude this figure is accurate. The ledger referenced in Government Exhibit G (that is, Government Exhibit 68) pertains to a different property, specifically, a property located at 123 Chestnut Drive, Smithfield, PA 15478. Of note, however, this ledger does not purport to have incurred an expense entitled "Makewhole paid to prior Investor (includes expenses)," which begs the question whether this expense is legitimate as set forth in the prior exhibits.

h.      302 Meadowlark Lane, West Mifflin, PA 15122 – at the outset, the defense notes this property also does not include an expense of "Makewhole paid to prior Investor (includes expenses)." Additionally, this property was sold at foreclosure for $67,000.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.

i.      130 Wetzel Road, Glenshaw, PA  15116 – the ledger at Government Exhibit 72 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation in the amount of $130,569.89.  The defense's objection to the inclusion of this value is the same as that which was expressed, *supra*.  In addition, the owner history obtained from the Department of Real Estate, Allegheny County Assessment records indicates the property was sold at foreclosure for $123,000.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.  *See* Defense Exhibit 8.

j.      436 Brownsville Road, Pittsburgh, PA  15210 – the ledger at Government Exhibit 76 indicates a "Makewhole paid to prior Investor (includes expenses)" expense, which is added into the loss calculation in the amount of $15,573.60.  The defense's objection to the inclusion of this value is the same as that which was expressed, *supra*.  In addition, this property was sold at foreclosure for $17,000.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.

k.      108 West Virginia Avenue, Homestead, PA  15120 – according to the Department of Real Estate, Allegheny County Assessment records, this property was sold at foreclosure for $32,500.00, which value does not appear to have been applied against the loss calculation attributed to Ms. Berger.  *See* Defense Exhibit 9.

The defense is troubled by the seemingly inexplicable exclusion of the resale value of the property to offset the loss proffered by the various PNC Bank ledgers.  With several of the National City/PNC loans, the government did not include among its roughly 100 exhibits attached to its brief the prior owner history clearly showing an offset to the bank's loss through sale of the foreclosed upon property.  The total value on the resale of these 11 loans is $507,160.00.  If applied against the government's proposed loss figure at Government Exhibit G, the total loss would be reduced to $507,620.14.

Additionally, the defense submits the total calculated loss on the Chestnut Street property must be excluded because there is no evidence to support the figure indicated at Government Exhibit G, thereby further reducing the loss to $404,621.14.

Finally, there appears to be a total of $301,451.25 in "Makewhole paid to prior Investor (includes expenses)" expenses included in the loss attributed to Ms. Berger. Absent some evidence to support the government's position that this cost should be attributed to Ms. Berger, the defense believes this unknown expense must be excluded from the loss calculation, as well. This would result in a loss calculation of $103,169.89 on the National City/PNC Bank defaulted upon loans.

For the Court to determine the loss in this case, the government *must* substantiate the loan value. While the sides might quibble about an appropriate value by which to offset the loss calculation (*e.g.* appraised value versus foreclosure value, etc.), there can be no disputing that it is impossible to calculate loss when "the exact loan amounts … are not known." Indeed there is some non-binding case precedent for calculating intended loss using the full amount of the loan offset by the fair market value of the property at the time the loan was made, where a borrower has not yet defaulted on his or her loan. Nevertheless, even to establish intended loss, the government **must prove the value of the loan**.

In all 100 government exhibits, there are only 11 loans for which there exists documentation to substantiate the unpaid balance of the loan. There is no documentation before the Court substantiating the full amount of any loan principal when it was lent to the borrower and, likewise, no evidence of the fair market value of the property at the

time the original loan was made.  Without loan values, unless the Court was inclined to agree that the loss figure should be the $103,169.89, which is supported by the various PNC Bank ledgers and real estate tax assessment records, then the Court must conclude a reasonable estimation of the loss is impracticable in this case.

C.     <u>LOSS ATTRIBUTABLE TO DEFENDANT FROM</u>

<u>OTHER MORTGAGE BROKERS</u>

The government asserts, "[T]he defendant is responsible for loss caused not only by loans in which Cowden was the appraiser and Steel City or First Federated was the broker, but for all loans in which Cowden was the appraiser."  *See* Government's Brief In Support of Loss, p. 16.

As a threshold matter, the defense respectfully requests the Court be mindful of the fact there is no evidence whatsoever upon which the government seeks to have the loss of other mortgage brokers *actually calculated*.  Government Exhibit A, attached to its brief, shows the "universe" of Cowden-appraised loans, for various mortgage brokers in western Pennsylvania.  However, as with the loss calculations for Steel City and First Federated, the government has not followed the directive of this Court to implement the holding in *Siciliano* to determine what the loss would be.  The "loss" caused by other mortgage brokers, assuming *arguendo* it **could** lawfully be attributed to Ms. Berger, must be determined by the unpaid balance of the mortgage offset by either fair market value, assessment value or the price at resale after a foreclosure.  Instead, the government implemented its "80% algorithm" to estimate "loss" on loans made using Mr. Cowden's

13

appraisals for First Capital Home Equity and First Atlantic Financial.  Nowhere in the brief or presently before the Court is there evidence of an actual loan amount: not an unpaid balance, not an original loan amount, not even evidence that the loan defaulted upon was the loan which was actually brokered by one of these companies.

It gets worse.  The government did not bother to procure foreclosure resale values or assessment values for properties which collateralized loans brokered by the remaining mortgage companies for which Mr. Cowden provided appraisals, specifically Financial Freedom Mortgage, People's Home Mortgage, TNT Financial and Commonwealth Funding.  Instead, the government wants this Honorable Court to calculate the loss from these remaining companies *without* an original loan value, *without* an unpaid balance on the mortgage, *without* any evidence whatsoever as to whether the loan originally brokered by these companies is still the current loan on the property, and *without* any information to offset the loan value such as an assessment, fair market or resale value on the property.  Instead, in its brief, the government figures about 50% of Mr. Cowden's $324,000,000.00 in appraisals were done for those remaining companies (*i.e.* Financial Freedom Mortgage, People's Home Mortgage, TNT Financial and Commonwealth Funding), so the loss calculated by the "80% algorithm" on the other mortgage brokers' loans should just be doubled.

It is worth noting, the government has previously acknowledged in open court that the loss caused by Mr. Cowden's appraisals did not exceed $2,500,000.00 (*see* Plea Colloquy of Kenneth Cowden, July 20, 2007, page 10).  To now suggest the loss caused by Mr. Cowden's appraisals, which should be attributed to Ms. Berger by virtue of her

14

association with him to be valued at $35,406,250, seems… disingenuous.  In addition to the fact the government has produced no evidence to substantiate the actual loss amount incurred by these brokers', there exists legal precedent which undermines the government's theory that Ms. Berger should be saddled with the loss caused by every fraudulent loan issued upon Mr. Cowden's appraisals in western Pennsylvania.

The mortgage fraud conspiracy before this Court centered on Mr. Cowden, not Ms. Berger.  At sentencing for Mr. Cowden, which proceeding was before this Court, the government unequivocally stated, "Obviously, the appraisal, as I found out in my last few years prosecuting these [mortgage fraud cases], is absolutely key," to which the Court responded, "It's critical."  Additionally, the government indicated Mr. Cowden was an extraordinary cooperator "in terms of the **sheer number of people that were prosecuted as a result** of at least his indirect cooperation." (Emphasis added.)  Mr. Cowden was the center of a true "hub-and-spoke" conspiracy.  It was *he* who conspired with the other mortgage brokers for whom he did business.  As to Ms. Berger, those other mortgage brokers were competitors.

For purposes of attributing loss amount at sentencing, it need not necessarily be shown that a defendant conspired with another, but, rather, that two or more parties jointly undertook criminal activity.  *See* U.S.S.G. § 1B1.3(a)(1)(B).  Indeed, even where there *is* evidence of a conspiracy between two parties, "the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy…" U.S.S.G. § 1B1.3, app. n.2. "[A] defendant is accountable for the conduct (acts and omissions) of others that was

both: (A) in furtherance of the jointly undertaken criminal activity; and (B) reasonably foreseeable in connection with that criminal activity." *Id.*

The Guidelines give a number of examples to assist the Court in determining what is and is not "jointly undertaken criminal activity" for purposes of attributing additional misconduct to the defendant at sentencing. The Guidelines provide the following example of conduct which is *not* jointly undertaken criminal activity and appears to be squarely on point in this case:

> Defendant P is a street-level drug dealer who *knows of other street-level drug dealers in the same geographic area who sell the same type of drug* as he sells. Defendant P and the other dealers *share a common source of supply, but otherwise operate independently*. **Defendant P is <u>not</u> accountable for the quantities of drugs sold by the other street level drug dealers** because he is not engaged in a jointly undertaken criminal activity with them.

U.S.S.G. § 1B1.3, Illus. (b)(6) (emphasis added).

In the foregoing example, as with Ms. Berger, the defendant and other dealers are direct competitors with one another – selling the same (illegal) product in the same market. Absent evidence the actors are sharing profits or pooling resources, they cannot be found to be engaged in jointly undertaken criminal activity. *Id.*

Another illustrative example is made using competitors in the distribution of child pornography, who derive their product from the same source.

> Defendant K is a wholesale distributor of child pornography. Defendant L is a retail-level dealer who purchases child pornography from Defendant K and resells it, but operates independently of Defendant K. Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates

16

independently of Defendant K.   Defendants L and M *are aware of each other's criminal activity, but operate independently*.   Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises the deliveries to Defendant K's customers.  Each defendant is convicted of a count charging conspiracy to distribute child pornography.  *Defendant K is accountable ... for the entire quantity of child pornography* sold to Defendants L and M … Defendant L is accountable … only for the quantity of child pornography he purchased from Defendant K because the scope of his criminal activity is limited to that amount.  For the same reason, Defendant M is accountable … only for the quantity of child pornography that he purchased from Defendant K.

U.S.S.G. § 1B1.3, Illus. (b)(4) (emphasis added).

In one of the earliest decisions from the Third Circuit analyzing the U.S.S.G. § 1B1.3, the court held:

[I]t is not enough to merely determine that the defendant's criminal activity was substantial.   Rather, a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role.

*U.S. v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992).

*Collado* involved distribution of heroin by two brothers, Antonio and Policai.  975 F.2d at 988.   At sentencing, the brothers had been attributed amounts of heroin distributed (a) before they joined the conspiracy; (b) distributed by one another; and (c) to the conspiracy by other conspirators.   *Id.*   On appeal, the Third Circuit concluded amounts distributed before the brothers joined the conspiracy were improperly included at sentencing.   *Id.* at 997.   The Court found the amounts distributed by each brother were properly attributed to the other.   *Id.* at 997-998.   The court remanded to the district court

17

for further factual findings and resentencing based upon the amounts distributed by co-conspirators to other co-conspirators. *Id.* at 998.

In crafting its decision, the Third Circuit relied upon an Eighth Circuit decision, *U.S. v. North*. The court held that in determining the appropriate relevant conduct to include in the offense level calculation, it was important to consider whether the drug transaction was executed and arranged with or without the knowledge of the defendant. *Id.* at 994 (quoting *U.S. v. North*, 900 F.2d 131, 134 (8th Cir. 1990), *reh'g. denied*, 1990 U.S.App.LEXIS 7984 (8th Cir. 1990)). Additionally, it is important to determine if the co-conspirators conduct was carried out with or without the assistance of the defendant. *Id.* at 994. Also, the Court cited the Eighth Circuit's guidance to consider whether the success of the conspirator's conduct was advantageous to the defendant. *Id.* Where a defendant had minimal knowledge of the conspirator's conduct, did not participate in the arrangement or execution of the conduct, did not assist in the conduct and did not benefit from it, the Third Circuit agreed with the Eighth Circuit that it would be incorrect to attribute additional conduct to the defendant at sentencing. *Id.*

The Third Circuit has stated:

> In order to be included in determining the defendant's offense level, the loss resulting from the acts or omissions of others must be: "(1) in furtherance of the jointly undertaken criminal activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake."

*U.S. v. Gricco*, 277 F.3d 339, 356 (3d Cir. 2002) (quoting *U.S. v. Duliga*, 204 F.3d 97, 100 (2d Cir. 2000), *cert. denied*, 530 U.S. 1222 (2000)); *see also U.S. v. Robinson*, 603 F.3d 230, 234 (3d Cir. 2010).

Although the Third Circuit ultimately determined it had been appropriate to attribute one brother's amount of heroin to the other and vice versa, the Court was very specific regarding the reasons this was so. *Id.* at 997-998. The Court determined that the evidence at trial showed the brothers having telephone conversations with other conspirators specifically about the other brother's involvement. *Id.* The two brothers also shared an apartment out of which they ran their business. *Id.* Further, at the brothers' apartment, there were several occasions on which drug transactions occurred and both brothers were present. *Id.* In sum, it was not simply that they were brothers and, therefore, must have known what the other was doing. Rather, the *evidence* demonstrated that the two were jointly involved in criminal activity.

In *Robinson*, the defendant pled guilty to conspiring to steal and convert U.S. Treasury checks. 603 F.3d at 231. An individual named "Jeffress" provided the checks to Robinson and three other individuals, including Travis Lynn. *Id.* Lynn had gone with Robinson on a couple occasions to cash the fraudulent checks. *Id.* Also, Jeffress routinely drove the check cashers to the check-cashing stores and, from this information, the district court concluded it was reasonable to infer Lynn and Robinson would have traveled together with Jeffress on the occasions which Lynn and Robinson were at the check-cashing location together. *Id.*

The Third Circuit upheld the decision to attribute only Lynn's loss caused by the check cashing to Robinson because of the fact the two seemed to be acting together by virtue of the undisputed fact they were together at the check-cashing store and the additional fact that Jeffress often served as the driver for the check-cashers. *Id.* However, in determining the attribution of loss to Robinson was appropriate, the Third Circuit focused a great deal on the implicit agreement between the co-actors. *Id.*

Regarding Ms. Berger, there was not *ever* an agreement to act in conjunction with her competitors to defraud federally insured institutions. To attribute the loss caused by Ms. Berger's competitors, the government must show that she *and her competitors* agreed to certain jointly undertaken criminal activity. It is not enough to simply show Ms. Berger had a conspiracy with Mr. Cowden, who, in turn, had other conspiracies with Ms. Berger's competitors. The government focuses on the fact Ms. Berger knew Mr. Cowden was providing appraisals to other brokers and, thus, by extension, she should therefore be accountable for the losses those brokers caused.[2] While this may touch on the issue of whether it was foreseeable to Ms. Berger that additional loss *could* be incurred by these brokers, the government cannot simply attribute additional loss to her without first establishing that she jointly undertook specific criminal activity with these individuals or entities. "[M]ere knowledge that criminal activity is taking place is not enough for sentence enhancement under § 1B1.3." *U.S. v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993).

---

[2] Additionally, it is worth noting Jay Berger indicated to SA Neal Caldwell that neither he nor Ms. Berger knew the mortgage brokers named on page 3 of the government's brief. Although Mr. J. Berger would testify he assumed Ms. Berger knew Mr. Cowden was providing appraisals for other brokers, it is the defense's position Ms. Berger never even knew the brokers whose loss the government seeks attribute to her. *See* Defense Exhibit 1.

Regarding the loss caused by ACF, the government relies upon not only the relationship Ms. Berger had with Mr. Cowden, but the additional fact that Ms. Berger and Ms. E. Berger are sisters.  Unlike *Collado*, however, Ms. Berger and Ms. E. Berger did not agree to defraud banks together.  There is not evidence, nor will there ever be evidence showing that Ms. Berger had any knowledge of the specifics of the fraud being perpetrated by her sister.  Ms. Berger did not agree to help her sister in anyway.  Furthermore, the two had different offices and worked independent of one another.  The two were competitors, effectively, conducting the same business independent of one another.

There is not, nor will there ever be, evidence before the Court that Ms. Berger agreed with her competitors to defraud banks.  This concept makes no sense at all.  Absent proof, even by a preponderance of the evidence, that such an agreement existed, enhancing Ms. Berger's offense level by the loss caused by any company other than SCM or FF is in error.


### D.    GAIN AS LOSS

The government seeks to further increase the amount of loss attributable to Ms. Berger by adding into the calculation the amount of broker fees earned by Ms. Berger, as well as the fees Mr. Cowden earned by doing appraisals.  The commissions earned by Ms. Berger and Mr. Cowden were their gain, not loss.  "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss, but it reasonably cannot be determined."  U.S.S.G. § 2Bl.1, cmt. app. n. 3(B).  For reasons

which are discussed, *infra*, the defense is of the position that the Court should look to Ms. Berger's gain as a substitute for loss in this case.  However, it must first be addressed why gain, in this case, should not also be added to the loss attributed to Ms. Berger.

In seeking to add the commission fees earned by Ms. Berger and Mr. Cowden to the loss calculation, the government relies upon U.S.S.G. § 2B1.1, cmt. app. n. 3(F)(v)(I). This note provides, in pertinent part:

> In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals … loss shall include the amount paid for the … services … rendered, with no credit provided for the value of those … services.

U.S.S.G. § 2B1.1, cmt. app. n. (3)(F)(v)(I).

The government cites *U.S. v. Curran* in support of its position that loss should be increased by the commissions earned by Ms. Berger and Mr. Cowden.

In *Curran*, the defendant held himself out as a medical doctor, when, in fact, he was a practitioner of naturopathy and did not even have a college education.  525 F.3d 74, 76 (1st Cir. 2008), *cert. denied*, 129 S.Ct. 295 (2008).  The court in *Curran* upheld the district court's decision to calculate loss using the total amount of money Curran received from his patients as a result of his fraudulent medical care.  525 F.3d at 82.

To obtain a loan collateralized by real property, it is uncontroverted that a property appraisal is necessary.  However, in typical practice, the appraisal is done at the request of the realtor for the buyer or the mortgage broker arranges the appraisal.  Stated differently, the appraisal is done *for* the mortgage broker.

22

In *Curran*, the defendant directly defrauded his patients.  In Ms. Berger's case, however, the appraisals done by Mr. Cowden for Steel City Mortgage brokered loans were done at the request of the mortgage brokers, Ms. Berger and Mr. J. Berger.  In essence, unless this Court were to conclude the Bergers were actually victims (a preposterous argument the defense does not even suggest to imply), the application note referenced does not apply.  Loss is increased by fees from fraudulent services only where the service was rendered by a professional who held himself out as being licensed to the victim.  In this case, Mr. Cowden performed the appraisals for Ms. Berger, so, unless, she is somehow a victim, the defense submits this note should not apply.

In the event the Court concludes that Mr. Cowden's commissions should be added to the loss calculation, however, for the reasons articulated in the section C above, "Loss Attributed to Lia Berger from Other Mortgage Brokers," the only commissions which should be added are those which Mr. Cowden earned by appraising properties for SCM and FF.

The problem of proof remains, however.  It is the defense's position that the government must *prove* (not merely extrapolate) the value of the commissions Mr. Cowden earned on appraisals he did for SCM and FF.  The value the government provided in its brief is based solely on a projection made from averages.  This is not proof: it's arithmetic, and more is required when the consequence is more time in jail for the defendant.

Additionally, there is no evidence before the Court that fees earned by Ms. Berger or her husband were a result of either being unlicensed.  In order to add income (*i.e.* gain)

from SCM commissions to the loss calculation on the basis of services being fraudulently rendered, the services necessarily must have been provided by someone "falsely posing as [a] licensed professional."  The Bergers and their companies were properly licensed and, thus, this provision does not apply to Ms. Berger's loss calculation.  Even if the Court does conclude that Mr. Cowden's appraisal fees for work he did for Ms. Berger should be added to the loss calculation, it goes much too far to add Ms. Berger's gain to the loss calculation as well, since there is no evidence before the Court that Ms. Berger's companies lacked the appropriate licensure.

### E.   GAIN

The Guidelines provide "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."

It is clear from the foregoing that determining the loss amount is complicated, especially since so much of what is attributed to Ms. Berger by the government comes from algorithms and arithmetic rather than evidence.  The government once held the position that Mr. Cowden caused a loss of less than $2,500,000.00.  The government now claims Ms. Berger, through her use of Mr. Cowden, caused a loss of $34,000,000.00. This is an irreconcilable disparity, even irrespective of Mr. Cowden's plea agreement.

The defense believes the government has proven $404,621.14 in loss from the documents provided by National City/PNC Bank.  While the defense would encourage the court to adopt this figure as the loss amount, the defense understands the Court may

be uncomfortable doing so if it finds the true nature of the loss was likely higher, even if not *proven* by a preponderance of the evidence.  In the alternative, the Court shall look to the gain to SCM and FF.

Through discovery, the defense received a document prepared by the FBI which indicates the gross revenues to SCM from Mr. Cowden's appraisals from 2002-2005 was $1,889,015.99.  *See* Defense Exhibit 10.  According to the document, "SA Joseph Bieshelt obtained SCM loan schedules in digital spreadsheet format that reflected broker fee income.  SA Bieshelt isolated the loans that used Cowden appraisals and totaled SCM annual fee income from the spreadsheets mentioned above…"  Again, that "gain" was $1,889.015.99.

In the same document, the government provides an alternative calculation of gain using extrapolation. … more algorithms.  Even that figure, however, is $4,543,181.43. The defense asserts that the $1,889,015.99 figure is the one based upon actual evidence, and, therefore, provides the most reasonable estimate of gain to SCM.  Furthermore, the $1,889,015.99 figure as a substitute for loss is consistent with the loss attributable to Mr. Cowden, an amount less than $2,500,000.00.


F.      **EQUITABLE SENTENCING**

It goes without saying that the loss figure which the Court calculates is likely to have a very  significant impact on Ms. Berger's sentence.  To that end, the defense is troubled by the government's assertion that Ms. Berger is responsible for $35,000,000.00 in loss when no one, not even Mr. Cowden, the man truly at the center of the mortgage

fraud ring, has been encumbered with that kind of figure.  The sentences received by others, to include Elleni Berger (36 months), Randy Berger (31 months), and Gus Pastergou (21 months), along with an examination of Jay Berger's PSR, will likely reflect that the loss figures attributed to them before any adjustments are similar to Mr. Cowden's loss figure.  It is not lost on the defense that Ms. Berger is the only defendant to have challenged the legal sufficiency of the search of her office and the money laundering conspiracy, coupled with the government's statement at the February 11, 2011 hearing on this matter that, had Ms. Berger entered into a plea agreement, the government would have gotten the benefit of an appeal waiver.  *See* Transcript from February 11, 2011 Hearing, page 17.

At the February 11, 2011 hearing, the government stated that the defense expected the government to agree to a loss amount for Ms. Berger, which was a value agreed to in other cases despite the fact the defense in this case did not enter into a plea agreement for Ms. Berger.  However, it has never been suggested or stated by the defense that the government should or have to stipulate to a loss amount.  The law, however, requires they prove it.  Asking the Court to find Ms. Berger to be responsible for $35,000,00.00 in loss would be inequitable as compared to the others involved in Mr. Cowden's mortgage fraud ring *even if they could prove it* because it is a figure so far outlying what other defendants have faced.  It is quite clear that the government *cannot* prove anything close to the loss amount they insist is appropriate.  It, therefore, does not seem to be a far cry to suggest this figure is punishment for the fact Ms. Berger asserted her constitutional rights.

The defense has offered some alternatives to the Court in light of the *actual evidence* that is available.  Fundamentally, the defense asks the Court to determine the loss amount based upon the evidence presented and principles of fundamental fairness. Only that much of the loss that is justified under the circumstances should be attributed to Ms. Berger.   Under no circumstances is the appropriate value anything close to $35,000,000.00.

Respectfully submitted,


/s/ J. Alan Johnson, Esquire
Pa. I.D. No. 10504

JOHNSON & EDDY, LLC
707 Grant Street
1720 Gulf Tower
Pittsburgh, PA 15219
Telephone: (412) 338-7490

Facsimile:   (412) 227-3851
jjohnson@johnsoneddy.com