# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )
            v.           )      Criminal No. 09-308
                               )
VASILIA BERGER,            )
                 Defendant    )

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

### Introduction

On November 10, 2010, defendant Vasilia Berger ("Defendant" or "VB") pleaded guilty to Count I (wire fraud conspiracy, in violation of 18 U.S.C. § 1349) and Count II (money laundering conspiracy, in violation of 18 U.S.C. § 1956(h)) of the Indictment filed at the instant criminal action. The wire fraud conspiracy involved fraudulent activity undertaken in connection with mortgage brokerage businesses. For sentencing purposes the court must determine the loss amount attributable to Defendant under the United States Sentencing Guidelines (the "Guidelines"), U.S.S.G. §§ 1B1.3, 2B1.1. VB argues that the loss amount attributable to her is $2,863,171.78, which is more than $2,500,000 but less than $7,000,000. ECF No. 64 at 11, 30. Under her position, the base offense level should be increased by 18 levels. U.S.S.G. § 2B1.1(b)(1). The government, on the other hand, argues that the loss amount is between $20,000,000 and $40,000,000,[1] ECF No. 67 at 40, which would result in a 22-level

---

[1] The government also argued that if the court did not include in the calculation all the mortgage brokers who used the services of Kenneth Cowden, the loss amount should at least include losses relating to the activities of Elleni Berger. If only those losses were included, the government asserted the loss amount would be more than $7,000,000, but less than $20,000,000. The government submitted a chart (ECF No. 67-1) showing the totals for all categories of loss for "All Cowden Loans" ($20,381,000), "All Credit, Steel City and First Federated [i.e., including

increase to the base offense level.  U.S.S.G. § 2B1.1(b)(1).  After review, the court determines that the loss amount attributable to VB is $6,694,745.27, which is more than $2,500,000, but less than $7,000,000.  For sentencing purposes under the Guidelines, VB's base offense level will be increased by 18 levels to reflect the loss amount attributable to her.

## **Factual background**

The conduct of the following individuals needs to be considered for the purposes of determining the loss amount:  VB, Jay Berger ("JB"), Elleni Berger ("EB"), and Kenneth Cowden ("Cowden").[2]  JB pleaded guilty to wire fraud conspiracy and money laundering conspiracy, EB pleaded guilty to wire fraud conspiracy, and Cowden pleaded guilty to conspiracy to commit offenses against the United States.

During the relevant timeframe, VB owned and operated Steel City Mortgage ("SCM"), a mortgage brokerage business.  ECF No. 60 at 5.[3]  The business was first located in Munhall, Pennsylvania.  It later moved to Freeport Road, Aspinwall, Pennsylvania, and then to Brilliant Avenue, also in Aspinwall, Pennsylvania.  Id. at 125.  JB owned and operated First Federated Mortgage ("FFM"), a mortgage brokerage business.  Id. at 5.  VB and JB were married in 2003 and merged their two businesses.  ECF No. 47 at 1.  By reason of the merger, those entities will sometimes be referred to as "SCM/FFM."

Cowden was a tax preparer who prepared income tax returns for JB.  ECF No. 60 at 7.  Sometime in 2000, JB introduced VB to Cowden.  Cowden began preparing VB's tax returns.

losses relating to Elleni Berger's activities]" ($7,645,000) and "Steel City and First Federated" ($4,300,000).  When the court, however, added the amounts listed under the "All Credit, Steel City and First Federated" column of that chart, the total amount was $6,860,000 not $7,645.000.  Thus under the government's own estimates the loss amount would have to be over $20,381,000 or less than $7,000,000.
[2] JB was indicted at Criminal No. 09-383, EB was indicted at Criminal No. 09-334, and Cowden was indicted at Criminal No. 07-217.
[3] ECF No. 60 is the transcript of the September 15, 2011hearing held to determine the loss amount attributable to VB for the purpose of determining her guideline range.

Id.  For both JB and VB, Cowden prepared tax returns understating their income.  Id. at 7.
Because JB liked the way Cowden "worked with the numbers", JB suggested Cowden become a
real estate appraiser.  Id. at 7.  Cowden prepared some appraisals for FFM even though he was
not a licensed real estate appraiser. Id. at 7-9.

Sometime prior to September 2000 (probably August 2000), VB introduced Cowden to
Mr. Louis Spartis ("Spartis"), who was a licensed appraiser.  Id. at 9, 11-12. VB arranged
Cowden's meeting with Spartis.  The purpose of the meeting was to determine whether Spartis
would allow Cowden to use his license.  Id. at 8, 10.  Pursuant to the agreement which was
drawn up by VB, Spartis would sign appraisals prepared by Cowden.  Spartis was paid $2,000
per month for Cowden being able to use his name and license.  Id. at 12.  The formal agreement
between Spartis and Cowden was witnessed by VB (at the time known as Vasilia Klimantis) and
executed on September 1, 2000.  Id. at 13; Ex. E.  As part of the agreement, Spartis provided
rubber stamps of his signature to Cowden and VB.  Id. at 11.  Except for the first three appraisals
prepared under the agreement, Cowden issued appraisal reports under Spartis' rubber-stamped
signature without first providing them to Spartis for his review.  Id. at 12.  Cowden was
permitted to sign appraisals under Spartis' name for FFM and SCM only and he needed
authorization from VB if he wanted to do appraisals for any other individual or entity.  Id. at 15.
Cowden prepared an average of forty appraisals per month and charged $300 per appraisal in
2000.  Id. at 15.  The agreement was in force in 2001.  In 2001, Cowden prepared roughly 400
appraisals for FFM and SCM and earned $130,000.  Id. at 15-16. An appraisal prepared by
Cowden would overstate the value of the property a minimum of $20,000.  On average, the value
of a property would be overstated by $40,000.  Id. at 17-18.  Pictures of the relevant property

being appraised would be altered to support the higher appraised value and the description of the condition of the property would not be accurate. Id. at 19.

EB, who is VB's sister, was also a mortgage broker. She owned and operated All Credit Finance ("ACF"). VB introduced Cowden to EB for the purpose of preparing EB's tax returns. Id. at 22. After Cowden was authorized by VB, he began preparing fraudulent appraisals for ACF. Id. at 22-23, 76. Cowden's appraisals for ACF were inaccurate in the same way as the appraisals he prepared for FFM and SCM and contained similar misrepresentations. Appraisals prepared for SCM, however, were more "aggressive" in that VB would ask Cowden to overstate the values and alter the pictures more than EB would. Id. at 24.

With respect to the way the appraisals were prepared, Cowden testified that VB would tell him to what extent the value of a property was to be inflated, what features the "pictures" were to show, and whether there were other specific requests for misrepresenting the property, its condition, its value, or its features. Id. at 17-21. While at the beginning of the arrangement Cowden would actually check the property for which the appraisal was to be prepared, later on Cowden did not check because he was told by VB, in essence, that it was not necessary. Id. at 20.

Sometime before February 15, 2002, investigators from the Pennsylvania State Board of Certified Real Estate Appraisers (the "Board") approached Cowden regarding an investigation into violations of the Pennsylvania Real Estate Appraisers Certification Act, 63 PA. STAT. ANN. § 457.1, et seq. Cowden informed VB, JB, and EB about the questioning. Id. at 27. After conducting its investigation, the Board, on February 15, 2002, issued an order directing Cowden to cease and desist from performing real estate appraisals and fined him $10,000. Id. at 28. Because Cowden failed to contact the Board, the fine was raised to $15,000. Id. Cowden

notified JB, VB and EB that he had been fined and ordered not to perform appraisals. Id. at 29. Cowden did not stop performing fraudulent appraisals and VB, JB and EB did not stop using his services. Id. One week before the fine was due, Cowden contacted JB about the fine, hoping that he might borrow some money from him to pay the fine. JB instead told him not to worry about the fine because "it would be paid." Id. at 30. Within a day from this conversation, JB faxed Cowden "a copy of the check that it was paid on and advised that it was not a loan . . . [and] that [SCM], [ACF], and [FFM] each paid five thousand dollars of it. They figured it was worth it to keep me in business." Id. at 30

Because Cowden could no longer use Spartis' name, Cowden contacted other mortgage brokers, including VB, to find out whether they were willing to provide him with the name of a licensed appraiser who would be willing to "work with him." Id. at 30-31. Cowden promised shorter turnarounds for issuing appraisals to brokers who provided names of willing licensed appraisers. Id. Cowden initiated the search for a broker willing to lend his name to fraudulent appraisals. Id. at 67. Eventually, Raymond Faber ("Faber"), an employee of EB's company, was the first one willing to "work with him" in issuing fraudulent appraisals. Id. at 31.

Cowden later "worked with" several other licensed appraisers for the purpose of issuing fraudulent appraisals for SCM, FFM, and ACF, and other mortgage brokers. Id. at 34. Cowden spoke with VB on a daily basis about the "business" and discussed with her that he was operating under different names given state investigators were "watching" him. Id. at 33. VB was aware that Cowden was providing his services to mortgage brokers, other than SCM/FFM and ACF, using other appraisers' names. Id. at 37. This way of doing business went on for several years (until 2005) when the FBI conducted a search of Cowden's residence. Id. at 31, 172-73.

Another witness for the government, Michelle Sacramento ("Sacramento"), testified about the scheme. Sacramento worked for VB's company, SCM, from 2000 to 2004. In 2005 she worked for EB's company, ACF. Id. at 104. Sacramento described her job as follows: "I held the same position at both companies and performed the same actions in regards to the fraudulent activity of both companies. There really wasn't any difference at either place as far as my job duties were concerned." Id. at 118. Sacramento was aware that Cowden was providing fraudulent appraisals and that EB and VB jointly paid the $15,000 fine imposed by the Board. Id. at 108-09. As described by Sacramento, the criminal enterprise included more than fraudulent appraisals. Specifically, the "creative financing", a term used within SCF and ACF to describe their common illegal practices, included: fraudulent verifications of employment, fraudulent verifications of deposit, fraudulent homeowner's insurance policies, fraudulent payment histories, fraudulent pay stubs, fraudulent bank statements, fraudulent checks and verifications of mortgage, fraudulent CPA letters, and more. Id. at 110-22. The person supervising the "creative financing" at SCM was VB, while EB directed similar practices at ACF. Id. at 119. SCM/FFM and ACF used Pittsburgh Settlement Company ("PSC") for closings. Id. at 122. PSC was operated by JB and VB. Id. Sacramento testified that VB and EB were "very close" and that she overheard conversations between them in which they were talking about some of the "creative financing" techniques mentioned above. Id. at 124.

When Cowden first started preparing fraudulent appraisals (2000-2001), he was doing it only for SCM and FFM and did not keep a record of all transactions. Later on, when he started preparing appraisals for other brokers, Cowden developed and maintained a "rack sheet". Id. at 17. The "rack sheet" was a "listing of every appraisal that was received in [his] office, every

request for an appraisal to be done by a company, by date, by who requested it. Id. at 43. There are 2,233 transactions listed on the rack sheet. Gov't Ex. A.

From the rack sheet, the government created several spreadsheets which were different subsets of the entire "rack sheet", including, Government Exhibit B (Cowden's appraisals between 2002 and 2005 prepared for SCM/FFM and ACF), Government Exhibit C (Cowden's appraisals for SCM and FFM), and Government Exhibit D (79 properties which went through foreclosure and for which SCM/FFM requested an appraisal from Cowden).

After holding hearings to determine the loss amount for the purpose of sentencing, VB filed her proposed findings of fact and conclusions of law (ECF No. 64) and the government filed its proposed findings of facts and conclusions of law (ECF No. 67).

## Standard of Review

In United States v. Duliga, 204 F.3d 97 (3d Cir. 2000), the Court of Appeals for the Third Circuit stated:

> Under U.S.S.G. § 2F1.1(a) [now U.S.S.G. § 2B1.1(a)], a defendant convicted of a crime of fraud receives a base offense level of six [or seven]. This offense level, however, is subject to increase depending on the amount of loss generated by the fraud. *See* U.S.S.G. § 2F1.1(b) [now U.S.S.G. § 2B1.1(b)]; *see also United States v. Boatner*, 99 F.3d 831, 835 (7th Cir. 1996). In calculating the amount of loss generated by the fraud, a sentencing court obviously may include amounts directly attributable to the fraudulent conduct of the defendant. *See* U.S.S.G. § 1B1.3(a)(1)(A). In addition, where, as here, the crime of fraud for which the defendant has been convicted involves jointly undertaken criminal activity, the sentencing court may also attribute to the defendant amounts of loss resulting from the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See* U.S.S.G. § 1B1.3(a)(1)(B); *see also Boatner*, 99 F.3d at 835. However, to do so, the loss resulting from the acts or omissions of others must be: (1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake. *See United States v. Evans*, 155 F.3d 245, 254 (3d Cir.1998); *United States v. Price*, 13 F.3d 711, 732 (3d Cir.1994); *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992).

Id. at 100-01.

Additionally, the Court of Appeals for the Third Circuit commented on the burden of proof applicable to the determination of loss amounts:

> The Government bears the burden of establishing, by a preponderance of the evidence, the amount of the loss for purposes of the sentencing enhancement. *See United States v. Napier,* 273 F.3d 276, 279 (3d Cir. 2001), *cert. denied,* 535 U.S. 1066, 122 S.Ct. 1937, 152 L.Ed.2d 842 (2002). Although the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate. [United States v.] Geevers, 226 F.3d [186], 193 (3d Cir. 2000)].

United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008).

The loss amount need not be proved with absolute certainty. The Court of Appeals for the Third Circuit noted: "[t]o determine loss, a sentencing court 'need only make a reasonable estimate' based on the available evidence--precision is not required. *United States v. Ali,* 508 F.3d 136, 145 (3d Cir.2007) (quoting U.S.S.G. § 2B1.1 cmt. 3(C))." United States v. Norman, Nos. 08-1658, 08-3876, 08-3849, 08-3969, 08-4556, 08-4816, 2012 WL 719342, at *8 (3d Cir. Mar. 7, 2012).

## Discussion

Given the nature of the wire fraud conspiracy and the evidence presented, it is a difficult, if not daunting, task for the court to determine the appropriate loss amount under the relevant Guidelines. Defendant argues that the loss amount attributable to her is more than $2,500,000 but less than $7,000,000. The government, on the other hand, argues that the loss amount is between $20,000,000 and $40,000,000. In any event, the base offense level must be increased by several levels. The only question is whether the base offense level should be increased by 18 levels, as suggested by Defendant, by 22 levels, as suggested by the government, or some other level based upon this court's determination of the amount of loss attributable to Defendant. The

court will first need to consider the scope of the jointly undertaken criminal activity and second will need to determine a reasonable estimate of the loss amount. With respect to the scope of jointly undertaken criminal activities the court will need to determine whether, as the government argues, EB's criminal activities and the criminal activities of other mortgage brokers were jointly undertaken with VB.

### A. Scope of the Jointly Undertaken Criminal Activity[4]

#### 1) Criminal Activities of EB

One major area of contention is whether the losses attributed to ACF, EB's company, should be included in the loss amount attributable to VB for the purpose of determining the actual guideline range for her sentence. Upon consideration, the court concludes that those losses should be attributable to VB. As explained below, the criminal activities of EB and VB were jointly undertaken.

Section 1B1.3 of the Guidelines promulgated by the United States Sentencing Commission, in relevant part, provides:

> **(a) Chapters Two (Offense Conduct) and Three (Adjustments).**
> Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
> **(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> **(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

---

[4] VB did not dispute holding her accountable for JB's criminal activity. The only issues she raised were with respect to being accountable for losses attributable to the criminal activities of EB and other mortgage brokers who used the services of Cowden.

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

. . . .

U.S.S.G. § 1B1.3(1)(A)-(B).

The Court of Appeals for the Third Circuit discussed what kind of losses would be included under § 1B1.3

"[i]n order to be included in determining the defendant's offense level, the loss resulting from the acts or omissions of others must be: '(1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake.' " *United States v. Gricco,* 277 F.3d 339, 356 (3d Cir.2002) (quoting *United States v. Duliga,* 204 F.3d 97, 100 (3d Cir. 2000)).

United States v. Robinson, 603 F.3d 230, 233 (3d Cir. 2010).

The commentary to § 1B1.3 of the Guidelines, in relevant part, states:

1. The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

2. A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.

   In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:

   (A)    in furtherance of the jointly undertaken criminal activity; and

   (B)    reasonably foreseeable in connection with that criminal activity.

Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. <u>In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)</u>. The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (<u>i.e.</u>, the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

U.S.S.G. § 1B1.3, cmt. n.1, 2 (2011) (emphasis added).

In <u>United States v. Collado</u>, 975 F.2d 985 (3d Cir. 1992), which dealt with criminal activities involving controlled substances, the Court of Appeals for the Third Circuit held:

We wish to emphasize that in deciding whether accomplice attribution is appropriate, it is not enough to merely determine that the defendant's criminal activity was substantial. Rather, a searching and individualized

inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role.

Id. at 995.

The Court of Appeals for the Seventh Circuit in United States v. Salem, 657 F.3d 560 (7th Cir. 2011), commented on the kind of factors that are relevant to determine the scope of jointly undertaken criminal activity:

> Several factors are relevant in determining the scope of jointly undertaken criminal activity: (1) the existence of a single scheme, *see United States v. Adeniji,* 221 F.3d 1020, 1028 (7th Cir.2000); (2) similarities in modus operandi, *see id.* at 1028–29 (noting that the defendants "took virtually identical steps in setting up mailing addresses and bank accounts for the fictional ... vendors" closely in time); (3) coordination of activities among schemers, *see id.* at 1028 (multiple telephone calls between phones associated with the defendants confirmed that they were coordinating their activities); *United States v. Giang,* 143 F.3d 1078, 1081 (7th Cir. 1998) (stating that the defendant's "close collaboration with his cohorts" established a joint undertaking); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(8); (4) pooling of resources or profits, *see Adeniji,* 221 F.3d at 1028 (sharing of proceeds); U.S.S.G. § 1B1.3 cmt. n.2, illus. (c)(6); (5) knowledge of the scope of the scheme, *see United States v. Thomas,* 199 F.3d 950, 954 (7th Cir. 1999); and (6) length and degree of the defendant's participation in the scheme, *see id.*

Id. at 564.

VB's argument focuses on the "jointly undertaken" activity aspect of the Guidelines. Specifically, she argues that her family relationship with EB is not sufficient to hold her accountable for losses resulting from EB's actions. VB argues SCM/FFM and ACF not only were separate, legally and physically, they were "competitors." Both arguments, however, fail to consider EB's and VB's jointly undertaken criminal activities.

The activities that link VB to EB go far beyond their family relationship. The joint actions of VB and EV with respect to Cowden's criminal activities create the requisite links to establish jointly undertaken criminal activity. As noted above, Cowden was first engaged by VB

to prepare fraudulent appraisals for SCM/FFM. Sometime in 2001, VB, who had made a substantial amount of money through the scheme up to that point, introduced Cowden to EB, who also was in the mortgage brokerage business. EB employed Cowden for purposes of issuing fraudulent appraisals in the same way he was doing for VB. While VB and EB might have operated businesses which competed in acquiring clients, they "compared notes" on how to maximize their illicit profits and both used the same settlement company – the company operated by JB and VB.

Defendant argues that because EB and she did not share profits, there was no jointly undertaken criminal activity between them. ECF No. 64 at 21. While profit sharing would certainly show joint activity, its absence is not fatal. Here EB and VB coordinated their efforts to continue the criminal enterprise by pooling their resources to pay the $15,000 fine imposed upon Cowden within the deadline set by the Board. That joint activity enabled their objectives of obtaining false appraisals from Cowden to continue for the benefit of both VB and EB.

VB points to the business entities being separate as another sign that there was no jointly undertaken criminal activity. Using separate entities is not the sole factor to consider. Here, EB and VB over a period of years shared knowledge about how to obtain the false appraisals, pooled resources to pay Cowden's fine in order for him to continue that criminal activity with their companies and utilized the same settlement company operated by JB and VB to close the fraudulent loans.

All the losses caused by EB's company, ACF, were reasonably foreseeable in light of VB's knowledge of ACF's modus operandi, including the "creative financing" methods used by both VB and EB, and the crucial assistance of Cowden. VB was fully aware of ACF's business, given the close relationship between VB and EB, the sharing of resources (such as Cowden) and

the use of the same settlement company which was operated by VB and JB.  VB and EB contributed to paying Cowden's fine just in time to allow Cowden to continue to produce fraudulent appraisals to be used in the criminal activities undertaken by VB, EB and JB.  Losses attributed to ACF "were within [VB]'s plain view."  Duliga, 204 F.3d at 101.

In light of all the evidence adduced, the court must conclude the government met its burden to show jointly undertaken criminal activity among VB, JB and EB.  The losses resulting from EB's criminal activities will be used to calculate losses attributable to VB.

### 2)  Cowden's appraisals not performed for SCM, FFM or ACF

The government is seeking to hold VB accountable for losses attributed to all fraudulent appraisals performed by Cowden, including those not performed for SCM, FFM or ACF.  VB argues those losses cannot be included in determining her guidelines range because those other brokers' activities were not jointly undertaken with her.  The court agrees with Defendant.

The evidence relied upon by the government is that VB was aware that Cowden was performing fraudulent appraisals for brokers other than SCF, FFM or ACF.  ECF Nos. 60 at 32-33; 37 and ECF No. 67 at 13.  This evidence, without some showing of jointly undertaken criminal activity, is not sufficient.  "[M]ere knowledge that criminal activity is taking place is not enough for sentence enhancement under § 1B1.3."  United States v. Evbuomwan, 992 F.2d 70, 74 (5th Cir. 1993).  The government emphasizes that VB played a "prominent" role in the conspiracy.  ECF No. 67 at 13.  That role, however, whether alone or combined with the knowledge of criminal activity, is insufficient.

> The mere fact that the defendant played a 'substantial' role is not sufficient. *United States v. Collado,* 975 F.2d 985, 995 (3d Cir. 1992). Instead, we must determine the scope of the joint criminal activity agreed to by the defendant, and assess whether the acts of others were foreseeable from that vantage point. *Duliga*, 204 F.3d at 100; *Collado,* 975 F.2d at 995.

Norman, 2012 WL 719342, at *10.

There was insufficient evidence of jointly undertaken criminal activities adduced with respect to appraisals performed by Cowden for brokers other than SSC, FFM and ACF. VB's involvement in Cowden's activities other than with SSC, FFM, and ACF, is minimal, if any at all, and "largely speculative, requiring a leap that the record, as it currently stands, cannot justify." United States v. Wilson, 380 F. App'x 120, 124 (3d Cir. 2010) (finding the district court abused its discretion when it failed to conduct a searching and individualized inquiry into the circumstances surrounding the defendant's involvement in the conspiracy, which in fact was relatively minimal and largely unspecified); see United States v. Evans, 155 F.3d 245, 254 (3d Cir. 1998) ("[T]here is no indication that the district court made a 'searching and individualized inquiry' into the extent of Evans' involvement, or the extent to which the coconspirators' conduct was in furtherance of and foreseeable from Evans' undertaking."). Cowden obtained work from those other brokers without involving VB and there is a paucity of evidence showing any coordination of activities, pooling of research or people, close collaboration or other kinds of action from which the court could reasonably infer VB was engaged in jointly undertaken activity with them.

In the application notes to § 1B1.3 of the Guidelines, a scenario is described which helps inform the court in this analysis. In application note 2(c)(6), the commentary describes the following scenarios:

> **(6)** Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity

and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3 app. 2(c)(6).  Here, viewing VB as defendant P and the source of supply as Cowden (supplier of false appraisals), the other brokers, who operated independently of Defendant, were akin to the other street-level drug dealers whose criminal activities cannot be found to be jointly undertaken with Defendant even though they shared the same source of supply.  EB and VB, on the other hand, are like defendant Q and the four other street-level dealers that, among other things, pooled resources making Q accountable for the activities of those street-level dealers – just like VB is accountable for the actions of EB.

In light of the lack of evidence linking VB to mortgage brokers, other than EB and JB, VB shall not be held accountable for losses attributed to those other brokers.

### B.  <u>Calculation of Loss Amounts</u>

In <u>Norman</u>, the Court of Appeals for the Third Circuit noted:

Under the Guidelines, the loss caused by a fraud offense is a specific offense characteristic that can increase the offense level. U.S.S.G. § 2B1.1(b)(1). . . . To determine loss, a sentencing court "need only make a reasonable estimate" based on the available evidence—precision is not required. *United States v. Ali,* 508 F.3d 136, 145 (3d Cir.2007) (quoting U.S.S.G. § 2B1.1 cmt. 3(C)). As with other sentencing facts, the government bears the burden of proving loss by a preponderance of the evidence. *United States v. Fumo,* 655 F.3d 288, 310 (3d Cir. 2011). Where, as here, the sentencing court's factual findings are challenged, we review for clear error. *United States v. Napier,* 273 F.3d 276, 278 (3d Cir. 2001).

<u>Norman</u>, 2012 WL 719342, at *8.

In <u>United States v. Siciliano</u>, 601 F.Supp.2d 623 (E.D. Pa. 2009), the district court dealt with a somewhat similar, but not identical, case of fraud.  The district court summarized the underlying facts of that case as follows:

On July 18, 2006, Dana Siciliano and June Kodiak, along with eight other individuals, were indicted for their involvement in a scheme led by co-defendant Mahn Huu Doan. *See* (Doc. 1-Indictment). The following facts summarize the indictment, to which all defendants have entered guilty pleas. Over a period of several years, Doan purchased or borrowed the identities of many individuals in the Asian-American community and used those identities to purchase properties throughout Philadelphia. In conducting his scheme, Doan would first buy the homes from the existing owners with one of his recruited identities in the "A" transaction. After the A purchase, Doan would then sell the properties to another acquired identity (in effect, to himself) in the "B" transaction at an artificially inflated price. Doan enlisted the help of an appraiser for the B transaction; the appraiser attested to the inflated values of the homes by claiming that they had been renovated or were in the process of being renovated. Using this sham appraisal, Doan would obtain a mortgage at the artificially inflated value of the home.

For the financing of the transactions, Doan utilized Encore Mortgage company, where both Dana Siciliano and June Kodiak were employed. In addition to conventional ones, many of the mortgages that Doan obtained for the B transaction were FHA-insured loans through HUD. From September 2001 until February 2003, Siciliano and Kodiak knowingly accepted fraudulent documentation in approving these FHA-insured and conventional mortgages. At one point in the scheme, several of the mortgages that were still partially unpaid were refinanced at an even higher value; the proceeds of these new mortgages were used to maintain payments on other outstanding mortgages. At another point in the scheme, Doan was incarcerated for another crime and was no longer able to maintain the mortgage payments on the properties. Siciliano's boss, Vincent Sirolli, with the knowledge that foreclosure on the properties might arouse the suspicion of law enforcement, directed Siciliano to keep track of all the outstanding mortgages in the scheme and maintain the payments.

Id. at 624-25 (footnote omitted).

The question before the district court concerned how to determine the amount of loss attributable to the defendants. In particular, the government's method for calculating the loss amount was in issue. The district court described the method used by the government as follows:

In providing its initial loss calculation, the Government divides the approximately 180 properties in the scheme into two categories: (1) properties where foreclosure has been completed and the properties resold; and (2) properties where foreclosure has not been completed or the properties have not yet been resold. As to Category 1, there are around 60 properties that have gone through foreclosure and where resale has occurred. The Government contends that the losses to be used in the sentencing calculation for these Category 1 properties are equal to the

amount of the principal that remains on the mortgage, plus the costs spent as a result of the foreclosure, less the amount that the property was actually resold for. The calculation is: Loss = Mortgage Balance [plus] Foreclosure Costs [minus] Property Resale Amount. The Government has provided loss statements from HUD for each of these homes in the first category. Using this method, the total loss for Category 1 properties, as applied to Siciliano and Kodiak, is $1,858,429.18. *See* (Doc. 237-Govt's Siciliano Sentencing Memorandum, at 5); (Doc. 238-Govt's Kodiak Sentencing Memorandum, at 5).

The more complicated situation arises from the Category 2 properties, those that have not yet been resold. Of the 180 properties total, there are about 120 Category 2 properties. In attempting to estimate the losses for these Category 2 properties, the Government uses the losses of the Category 1 properties. It argues that the "vast majority" of the properties in the scheme were in similar areas of Philadelphia, were similarly priced, and were similarly valued. Given these similarities, the Government first calculated the average percentage loss for all of the Category 1 properties that have been resold. The calculation for the average percentage loss is: Percentage Loss = Average Dollar Loss for Category 1 [divided by] Average Mortgage Balance for Category 1. After calculating the Category 1 average percentage loss, 38%, the Government argues that an identical 38% loss should be applied to the remaining balance of each of the Category 2 mortgages. Using this methodology, the estimated loss is $2,089,997 for the FHA-insured Category 2 properties, and $1,198,748 for the commercial mortgage Category 2 properties. Together, the Government's estimated loss for the Category 2 properties is $3,288,745. When combined with the actual loss of the Category 1 properties, the Government estimates the total loss applicable to Siciliano and Kodiak to be about $5,147,174. *See* (Doc. 237-Govt's Siciliano Sentencing Memorandum, at 5); (Doc. 238-Govt's Kodiak Sentencing Memorandum, at 5).

Id. at 627-28 (footnoted omitted).

The district court discussed the relevant caselaw in determining the appropriateness of the

methodology used:

[T]hree opinions outline an apparent order of preference in calculating the value of real estate for purposes of loss calculation. First, the Third Circuit's decision in [United States v.] Sharma, [190 F.3d 220 (3d. Cir. 1999),] indicates that the use of an appraisal value for a property is an appropriate means of calculating loss. The subsequent decision in [United States v.]Napier, [273 F.3d 276 (3d Cir. 2001),] however, suggests that the resale price of a property is more accurate than an appraisal price. Finally, [United States v.] Anderson, [216 F. App'x 258 (3d Cir. 2007),] indicates a presumption that the actual realized resale price of a foreclosure property is the value to be used, that the bank has every incentive to maximize the price of the property at this sale, and that defendants can not

overcome this presumption without providing some evidence to show that these resale prices were not genuine arms-length values.

Id. at 631-32.

In applying this methodology, the district court concluded:

First, the Court decided to distinguish, for purposes of the loss calculation, between Category 1 properties and Category 2 properties. As for those 60 or so properties in Category 1 that have gone through foreclosure and been resold, the Government's suggested methodology-using the actual prices from the resale-was used, rather than the appraisal prices offered by Siciliano and Kodiak's expert. Thus, the loss for Category 1 is $1,858,429.18.

Id. at 632.

With respect, to Category 2 properties, the district court first noted that the report prepared by Siciliano's expert, Mr. Eugene Pasymowski ("Pasymowski"), "calls into question the accuracy of the government's rough averaging. Pasymowski's opinions are certainly subject to substantial criticism on several grounds." Id. Despite the doubts the court had concerning some of the opinions expressed by Pasymowski, the district court commented:

[T]he regression analysis that he performed to predict the home values was more sophisticated than the Government's across the board 38% average loss. As the Third Circuit's decision in [United States v.] Anderson, [216 F. App'x 258 (3d Cir. 2007),] suggests, a defendant may rebut the factual basis of the Government's proposed sentence enhancement and ultimately prevent the Government from satisfying its burden of persuasion on the issue. Anderson, 216 Fed. Appx. at 262. While the Government's calculation is not necessarily wrong, Mr. Pasymowski's report and testimony, specifically the regression analysis that he performed, gave the Court some doubt about the Government's average of a 38% loss for all properties.

This Court's doubt on the calculation is significant. For only the Category 1 properties, at a loss amount of $1,858,429.18, the Sentencing Guidelines call for a 16 point offense level enhancement. If the Court were to fully adopt the Government's loss calculation methodology for the Category 2 properties, the Sentencing Guidelines would instead call for an 18-point enhancement to Siciliano and Kodiak's offense level for the total loss on all properties. See USSG § 2B1.1(b)(1) (providing that a court should apply a 16 point offense level enhancement if the loss is more than $1,000,000, or should apply an 18 point offense level enhancement if the loss is more than $2,500,000).

Id. at 633-34.

With this background, the court must now consider the parties' arguments with respect to each kind of loss identified by the government.

### 1) Losses Resulting from activities of SCM/FFM

#### a) PNC/National City loans

The government argues the loss amount attributable to Defendant pertaining to loans funded by National City Mortgage ("National City"), whose successor in interest is PNC Bank ("PNC" and as successor to National City, "PNC/National City") is $979,722.54 (Gov't Ex. FF) (after deducting interest). Defendant acknowledges that losses of at least $680,044.82 (ECF No. 64, at 27), should be attributed to the PNC/National City loans and argues that the government erred in including "make whole expenses" and losses from properties for which an unpaid principal balance was not provided. Each of those matters will be reviewed.

#### i) "Make-Whole Expenses"

Defendant argues that the loss amount should not include "make-whole expenses". ECF No. 64 at 25. She asserts that "funds paid as reimbursement to the investor who purchased PNC Bank's loan should not be added into the loss to PNC Bank because it was an expense wholly unrelated and unforeseeable to the defendant and her company." Id. Defendant submits that including make-whole payments "allows for double-counting of loss." Id. at 26.

A make-whole payment reimburses the investor, who purchased a loan from PNC, for losses incurred that PNC would otherwise have incurred itself. (ECF No. 60 at 86-87). These losses include taxes, property maintenance, insurance premiums, hazard loss expenses, appraisals, property inspections, and "other." (Gov't Exs. 154-164). For example, a review of Government Exhibit 155, in conjunction with the testimony of the PNC representative, Mr. Lynn

Rowland, reveals that the investor, Freddie Mac, stated the amount due from PNC/National City was $148,446.03. The government in its calculations included only $21,530.67 because it limited the make-whole expenses used in calculating the loss amount to "Selling expense," "Expenses," and "General & Administrative Expenses." Specifically "lost interest" [5] and other items were not used in the calculation. PNC would incur the same kind of expenses as reflected in the make-whole expenses used in the government's calculation when a debtor fails to make the mortgage payments and PNC starts the foreclosure process. For example, after a debtor defaults, PNC may pay property taxes on the property until the property can be resold. PNC/National City had an agreement with some investors, mainly Freddie Mac and Fannie Mae, that it would buy back the mortgages in the case of fraud and reimburse the investor for any losses resulting from the fraud. (ECF No. 60 at 81). Ultimately, the expenses included by the government in the calculation of the loss amount result from foreclosure timing issues.

If Freddie Mac starts the foreclosure process before reselling the mortgage to PNC/National City, it may incur some expenses related to this process. These are the same kind of expenses noted above that PNC may incur during the foreclosure process. If PNC repurchases a loan from Freddie Mac prior to the foreclosure process starting, however, the investor arguably would not have incurred any such expenses for PNC to reimburse. It must be noted that even if an investor (such as Freddie Mac) starts the foreclosure process, PNC still may incur some of the foreclosure expenses out-of-pocket itself. It is simply a timing issue. For example, if Freddie Mac starts the foreclosure process and pays two months of property taxes, and PNC buys the loan and mortgage back from Freddie Mac at a price that includes the property

---

[5] Defendant and the government agree that "lost interest" or accrued, unpaid interest is not included in the loss amount. U.S.S.G. § 2B1.1 cmt. n.3(D)(i) ("Loss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." ).

taxes paid by Freddie Mac, those property taxes would be included in the payments for "make-whole investor" in calculating the losses. At this point, if PNC starts paying the property taxes until the property can be sold, it would include those amounts as "taxes" – while also including the amount it paid the investor for property taxes under the category "make-whole investor."

In light of the evidence adduced, the court concludes that the make-whole payments used in the government's calculations are reimbursement for out-of-pocket costs that investors incurred in the foreclosure proceedings and that would have been paid by PNC if it had not sold the loan. PNC had to reimburse the investor for those expenses as a result of Defendant's fraud and suffered a loss. As such, the make-whole expenses are losses properly attributable to Defendant.

Additionally, Defendant argues that make-whole payments should not qualify as "actual losses" because she had "no way of knowing *if* the lender intended to sell its loan to another company because the decision to do so happens after the loan has been negotiated and funds disbursed to the borrower." ECF No. 64 at 26 (emphasis in original). The court disagrees. "[I]t is widely known that mortgages are routinely repackaged and resold; therefore, secondary lenders suffer significant losses, when the purchasers fail to make mortgage payments on purchased properties. Due to the sale of loans . . . , the final mortgage lenders on the properties are the victims of the conduct of [the defendant]." United States v. Snow, No. 11-702, 2012 WL 401521, at *8 (10th Cir. Feb. 9, 2012). When the original mortgage lender (PNC/National City) has to buy back a fraudulent loan, it is the final victim of VB's conduct.

Government Exhibit FF refers to a loan secured by a property located at 31 Friday Road, Pittsburgh, Pennsylvania, for which the government asserted a loss of $24,969, but did not provide a separate exhibit showing its calculation, as it did for the other (eleven) properties listed

in Government Exhibit FF (Gov't Exs. 154-164). Accordingly, any loss associated with the property located at 31 Friday Road, Pittsburgh, Pennsylvania, will not be attributed to Defendant because the court is unable to understand how the government calculated that loss. Therefore, the loss amount calculated by the government must be reduced by $24,969.

Government Exhibit 164 is identical to Government Exhibit 31 and both pertain to the same property referred to in Defendant Exhibit 5. While those two government exhibits involve the same property, the loss calculation shown on Government Exhibit 31 is widely different from the loss calculation shown on Government Exhibit 164. Pursuant to Government Exhibit 31, the loss attributable to the Defendant is $36,632.84. Pursuant to Government Exhibit 164, the loss attributable to the Defendant is $83,083.73. The differences between those two exhibits are the amounts of the actual unpaid principal balance, the interest accrued and the make-whole payment to the investor. Each exhibit shows the same date on which they were prepared. This loss was also listed in government exhibit D for $31,808.84. Because it is impossible for the court to determine what is the proper loss attributable to Defendant with respect to the loan secured by the same property identified in Government Exhibit 31, Government Exhibit 164, Government Exhibit D, and Defendant Exhibit 5, no loss will be attributed with respect to the loan secured by the property referred to in those exhibits mentioned above. Therefore, the loss will not include any loss amount relating to the loan secured by this property and $83,083.73 must be deducted from the government's calculation of the loss amount.

In light of the foregoing discussion, the amount of loss the government asserts is attributable to VB from the PNC/National City loans ($979,722.54) needs be reduced by $108,052.73 ($24,969 – the amount for which no calculation was provided –and 93,083.73 – the

amount for which conflicting calculations were shown). The amount of loss arising from the PNC loans attributed to VB is $871,669.81.

## ii) Unpaid principal balance not shown

Defendant argues that "[i]n certain instances the fair market value of the property did not properly offset the unpaid balance of the loan for certain of the PNC Bank loans. . . . The appropriate market value which should have been applied to the loans at issue totaled $233,960.00". ECF No. 64 at 7 (citing Def. Exs. 5-9). Defendant is correct, in part. Defendant specifically identified only five loans as being implicated in this concern. (Def. Exs. 5-9).

Defendant Exhibit 5 refers to a loan secured by the property located at 5098 W. Harbison Rd., Pittsburgh, Pennsylvania, and described in Government Exhibits 31 and 164. Because, as noted above in the make-whole expenses analysis, it is impossible for the court to determine what is the loss attributable to Defendant for the loan secured by that property, no loss shall be computed with respect to any loans made in connection with that property.

Defendant's Exhibit 6 refers to a loan secured by the property described in Government Exhibits 48 and 161, located at 3162-3164 Brighton Road, Pittsburgh, Pennsylvania. Here, the government used the actual unpaid principal balance of the loan to calculate the loss of $90,725.30. Gov't Exs. 48, 161. Defendant's challenge on this ground with respect to this loan is without merit. It does not appear the government attributed this loss more than once, and Defendant does not argue otherwise. Accordingly, the loss associated with this loan ($90,725.30) is properly included in the loss amount attributable to Defendant.

Defendant Exhibit 7 refers to the loan secured by property described in Government Exhibits 60 and 159. The property is located at 900 Rock Avenue, Beaver Falls, Pennsylvania. The government showed the unpaid balance of the relevant loan and the resale price in its

exhibits 169 and 60. Those exhibits are the same except that on Government Exhibit 159 net accrued interest was deducted, making the loss $41,822.78, which is the loss attributed to VB by the government for that loan. The government met its burden to show a loss in that amount should be attributed to VB.

Defendant Exhibit 8 involves the loan secured by property located at 130 Wetzel Road, Glenshaw, Pennsylvania and identified in Government Exhibits 72 and 155. A review of those exhibits reveals the government identified the unpaid balance of the relevant loan and the resale price of the mortgaged property in its exhibits. Those government exhibits are the same except that Government Exhibit 155 shows a deduction for net accrued interest. The amount shown on that exhibit is sufficient for the government to have met its burden. $138,273.35, as shown on Government Exhibit 155, should be included in the loss amount attributed to VB.

Defendant Exhibit 9 and Government Exhibits 77 and 160 all relate to a loan secured by property located at 108 W. Virginia Avenue, Homestead, Pennsylvania. The government in its exhibits showed the unpaid balance of the loan and the resale price of the mortgaged property. The only difference between the government's exhibits is that net accrued interest is deducted on Government Exhibit 160. Under those circumstances the loss of $55,168.71, shown on Government Exhibit 160, relating to that loan should be included in the loss amount attributable to Defendant.

In light of the foregoing decision, no further deductions are warranted under this category.

### b) Other lenders - Foreclosed/resold properties

Defendant argues in opposition to the inclusion of losses from non-PNC lenders where the mortgaged property was foreclosed and resold that in some instances the loss calculated by

the government did not show the unpaid principal balance of the loan and thus may have improperly included accrued interest. With respect to the government not adducing evidence of the unpaid principal balance of a loan, the Defendant argued: "The problem with Government Exhibit X [non-PNC loans brokered by SCM/FFM] (and certain other exhibits which support Government Exhibit X) occurs when the government asserts loss can be calculated using the demand value or judgment value instead of starting with the unpaid balance of the loan." ECF No. 64 at 24.

It is worth noting that once the government makes a prima facie case, "the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008); United States v. Geevers, 226 F.3d 186, 193 (3d. Cir. 2000). As previously discussed, the government's burden is only to adduce evidence to support a reasonable estimate. Ali, 503 F.3d at 145. The government acknowledged that it is possible – as pointed out by Defendant – that the demand value or judgment value may include accrued interest, as well as the unpaid principal balance of the loan. The government noted, however, it "more than compensated for that [possibility] by not including any of the lender expenses associated with the foreclosure process . . . including attorney fees, property management fees, insurance, and taxes that often amount [to] $10,000 or more." ECF No. 67 at 28.[6] Because the government did not include those kinds of expenses, the use of the demand or judgment value provides a reasonable basis to estimate the loss amount. The court therefore concludes that using the demand value or judgment value is a reasonable basis on which to estimate the unpaid balance; provided, the foreclosure expenses are not included in the loss calculation.

---

[6] The same reasoning applies to using the demand amount which may likewise include interest. The government did not include expenses associated with the foreclosure process with respect to losses calculated by using a demand value. See Gov't Ex. 127.

There were several instances in which the government calculated the loss amount by using a formula, rather than the actual unpaid principal balance, the judgment amount or demand amount. The formula used was to estimate the unpaid principal balance by multiplying the appraised value Cowden had on his rack sheet by 80%. With respect to this 80% formula, the government noted :

> As Special Agent [Neal] Caldwell testified, the 80% figure was used as an estimate of the likely loan amount and the unpaid principal balance at the time of foreclosure. The 80% figure, according to Special Agent Caldwell, is based on the industry standard for that time for funding loans at 80% of the value of the underlying collateral.

Id. at 28-29. The problem with the 80% formula is that it assumes that the borrower was financing the purchase price of the property. Borrowers, however, may obtain a mortgage to obtain an equity line of credit or to finance the remodeling of a property. If the loan is made in that context, it may have been for an amount lower than 80% of the appraised value. ECF No. 61 at 24-25. During the cross-examination of the government's witness, the following colloquy took place:

| | |
|---|---|
| Q. (Defendant's Counsel): | I can point to any one of those 80 percent figures – let's just run down here, close my eyes. Here's somebody named Bardwell – I lost Bardwell – I have it here. Okay. Cowden's value, 125; 80 percent of that 121,600. Am I right? |
| A. (Government's Witness): | Correct. |
| Q. (Defendant's Attorney): | But we don't know with regard to that mortgage whether or not there was borrowing for college educations, an automobile, remodeling, furniture, whatever you can get an equity loan for, do we? |
| A. (Government's Witness): | Correct. |

| Q. (Defendant's Attorney): | Okay. So if that's the case, my point is this: That would undercut the accuracy of those figures, would it not? You said before I made a good point, but would you tell me why I made a good point. |
|---|---|
| A. (Government's Witness): | Potentially a transaction may not be for the full appraised value of a transaction. |

ECF No. 61 at 26. With that background the court cannot reasonably assume that the borrower obtained the loan to finance the purchase of the property. The court simply cannot determine whether the estimate is appropriate under those circumstances and must conclude that any loss calculated using the 80% formula will not be attributable to Defendant.

Defendant identified four loans as falling within this kind of situation. Those loans are shown on Government Exhibits 101, 102, 124 and 136. With respect to the loan identified on Government Exhibit 101 (secured by the property located at 3707 2nd Avenue, Beaver Falls, Pennsylvania), the government noted it used the 80% formula to estimate an unpaid principal balance of $102,000. The government's exhibit, however, shows there was an amount due the lender of $102,584.89. The amount due the lender is similar to a judgment amount. Because the exhibit shows the equivalent of a judgment value or demand value which is substantially the same as the 80% formula value used by the government, the court sees no reason not to include the loss attributable to that loan in the calculation of the loss amount attributable to Defendant.

Government Exhibits X and 102, referring to a loan secured by property located at 1320 Leishman Avenue, New Kensington, reflects that there was a demand value shown for that loan (Gov't Ex. 102). The demand value shown, however, is less than the 80% value, i.e., the 80% value estimated an unpaid balance of $116,000 (Gov't Ex. X), while the demand value would

result in an estimated unpaid balance of $89,672.19 (Gov't Ex. 102). Using the demand amount as the estimate for the unpaid principal balance would lower the loss asserted by the government by $26,328. (the difference between the 80% formula value and the demand value). Since the demand value is a more reasonable estimate, this reduction must be taken from any loss amount asserted by the government.

With respect to the loan identified in Government Exhibit 124, which was secured by property located at 557 Delaware Avenue, Washington, Pennsylvania, the court could find no equivalent of a judgment or demand value on that exhibit. Thus the government would have to rely entirely on the 80% formula to determine an estimate of the unpaid principal balance. The court, as noted, has insufficient information to be satisfied that the 80% formula would be an appropriate method to use in estimating the equivalence of the unpaid principal balance. In light of that conclusion no loss can be attributable to that loan and $63,920 asserted as a loss by the government will not be included in the calculation for the loss amount attributable to Defendant.

With respect to the loan identified in Government Exhibit 136, which was secured by property located at 111 Westview Drive, Ligonier, Pennsylvania, the loss calculation made by the government and reflected on Government Exhibit X shows that the government was using the 80% valuation method to estimate the unpaid principal balance of $228,000.00. Government Exhibit 136, however, shows an amount due the lender of $240,062.46, which would be the kind of value the court would deem appropriate to use for estimation purposes. Since the amount due lender is akin to the demand value, it is the reasonable basis on which to estimate the unpaid principal balance, as long as foreclosure expenses are not added. With the estimate of the unpaid principal balance being $240,062.46, the loss amount calculated by the government must be increased by $12,062.46.

The government in Government Exhibit X asserts that the loss from this category of loans (i.e., Non-PNC lenders - Foreclosed/resold properties) to be attributable to Defendant was $2,813,231.28. The court, however, excluded from that amount $63,920.00 (the amount reflected on Government Exhibit 124) and $26,328.00 (the amount reflected on Government Exhibit 102). The court must also increase the loss amount by $12,052.46, (the loss reflecting the amount due lender on Government Exhibit 136). The resulting loss that the court finds should be properly attributable to Defendant for this category is $2,735,035.46.

In summary, while the court agrees that the methodology used by the government with respect to estimating the unpaid principal balance by reference to a judgment amount, demand amount or the equivalent of that kind of amount (the amount due lender) is not particularly precise, the court finds that it is a reasonable estimate since the government did not include in its loss calculations costs or expenses associated with the foreclosure process such as attorney fees, property management fees, insurances and taxes. The court, however, concluded that the 80% formula value is not a reasonable estimate unless there is evidence to indicate that the relevant loan was for the purchase of the property, rather than for a home equity loan.

### c. Other Lenders – Foreclosed/resold during court proceedings

Four properties originally included in the list of foreclosed but not resold properties (Gov't Ex. Y) were sold while these proceedings were pending. (See Gov't Exs. 137 and K, 142 and L, 141 and II and 139 and JJ.) The main objection raised by Defendant is that the loss with respect to these loans cannot be determined with accuracy because it is unclear from the evidence offered by the government whether the loss amount includes interest on the principal amount due. See ECF No. 64 at 24. A review of the evidence easily disposes of the argument. To determine the loss, the government used the principal amount due at time of foreclosure,

added to that figure the amount the lender paid for the property at foreclosure, and then credited against that amount the proceeds from the sale. The loss amount did not include interest. <u>See</u> ECF No. 67 at 30; Gov't Exs. 137, 139, 141, 142. The government in calculating the loss used the principal amount of the loan due and owing, but did not include any unpaid interest in the loss amount calculation. Accordingly, the loss amount attributable to Defendant for foreclosed properties resold during the pendency of these proceedings is $234,074.00.

### d. Other Lenders – Foreclosed/not resold

As of the time of the hearing, there were two loans secured by properties (Gov't Exs. 47/138 and 53/140) that were foreclosed, but not resold. The government used a similar methodology for calculating the loss, i.e., identified the principal amount due at time of foreclosure, added to that figure the amount the lender paid for the property at foreclosure, and credited the assessed value of the property. This method does not include any loss for accrued interest. According to the government's calculation, the loss attributable to Defendant from those properties is $83,257. Defendant did not raise any objection with respect to the methodology used by the government for calculating loss on foreclosed properties not resold. ECF No. 64 at 25. Since using the assessed value was not challenged as a reasonable basis upon which to estimate the loss, $83,257 is properly included in the loss amount. <u>See</u> Gov't Ex. Y; <u>see</u> <u>also</u> <u>United States v. McCully</u>, Cr. No. 09-201 (W.D. Pa.)((ECF No. 40).

### e. Cowden's appraisal fees

The government is seeking to add Cowden's appraisal fees to the loss amount attributable to Defendant. Defendant argues that those fees cannot be included in the loss amount because, in essence, there are no victims. ECF No. 64 at 28 (relying on U.S.S.G. § 2B1.1, cmt.

n.3(F)(v)(I)).[7]  In addition, Defendant argues the appraisal fees do not qualify as loss because the relevant borrowers never paid those fees.  The court disagrees with Defendant.

Cowden was not a licensed appraiser and was paid for his services, i.e., to prepare fraudulent appraisals.  The only issue is who were the victims of Cowden's conduct.  Defendant argues that since Cowden prepared the appraisals for Defendant, Defendant is the only "victim." Because deeming Defendant to be a victim would be "preposterous," Defendant argues that the appraisal fees should not be included in the loss amount.   While the court agrees that it is preposterous to think of VB as a victim, Defendant's argument is flawed.   There are many victims[8] here and VB is certainly not one of them.  The appraisals were, among other features, fraudulently inflated for the purpose of misleading lending institutions and the appraisal fees were paid by the borrowers.  See Gov't Ex. HH, ECF No. 60 at 185.  The borrowers needed the appraisals to obtain the loans.  The payments made by the borrowers for fraudulent appraisals make them victims – they sustained a part of the actual loss.  The appraisal fees of $363,968 are losses for which VB must be held accountable. See Gov't Exs. HH, B.

### f.  Losses Resulting from EB's criminal activities

Defendant argues that the losses resulting from EB's criminal activities should not be attributable to VB because the evidence adduced with respect to EB's company, ACF, did not comport with Siciliano.  Specifically, Defendant argues: "The directive in Siciliano is clear: loss equals the unpaid balance of the loan, plus costs associated with foreclosure, less market value of

---

[7] U.S.S.G. § 2B1.1, cmt. n.3(F)(v)(I), in relevant part reads as follows:
> In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; . . . loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

Id.

[8] A "victim" is defined in the Guidelines as "any person who sustained any part of the actual loss . . . . "  U.S.S.G. § 2B1.

the collateral property." ECF No. 64 at 22. <u>Siciliano</u>, however, does not stand for the proposition that unless the government provides the exact amounts of the unpaid balance, costs associated with foreclosure and the market value of the property, the government would fail to prove the amount of loss. Defendant reads too much into <u>Siciliano</u>. First, in <u>Siciliano</u>, the defendants introduced the testimony of an expert to rebut the government's analysis. Notwithstanding some problems with the expert's conclusions, the district court found that the defendants rebutted the factual basis of the government's proposed method with respect to a category of properties that had not yet been resold. In particular, the district court found that the "regression analysis" performed by the defendants' expert was "more sophisticated" than the government's method. Here, VB did not offer an alternative method of computation, but simply questioned the accuracy of the government's method. Merely raising an argument did not "prevent the Government from satisfying its burden of persuasion on the issue." <u>Siciliano</u>, 610 F.Supp.2d at 633. Second, Defendant fails to appreciate that "[i]n making a loss calculation, '[t]he court need only make a reasonable estimate of the loss.'" <u>United States v. Fumo</u>, 655 F.3d 288, 310 (3d Cir. 2011) (quoting <u>United States v. Ali</u>, 508 F.3d 136, 145 (3d Cir. 2007)). "Although it is possible that the Government made errors in the course of its calculations, there is no reason to think that its figure was not a 'reasonable estimate' of the loss, established by a preponderance of the evidence." <u>Id.</u>

Defendant argues that the losses resulting from EB's conduct should not be included in VB's loss amount because VB did not have the opportunity to cross-examine the expert whose report was relied upon by the government. ECF No. 64 at 8. The evidence offered by the government to support the loss amount associated with EB's conduct consisted of an expert report prepared in anticipation of litigation on behalf of EB for use at her sentencing hearing.

Gov't Ex. I.  The report was introduced in this case over the objection of Defendant.  Defendant fails to recognize that "[t]he law on this issue is well settled. Both the Supreme Court and this Court of Appeals have determined that the Confrontation Clause does not apply in the sentencing context and does not prevent the introduction of hearsay testimony at a sentencing hearing." United States v. Robinson, 482 F.3d 244, 246 (3d Cir. 2007) (citations omitted).

In Robinson, the court of appeals noted:

> Prosecutors, of course, may not introduce any and all hearsay testimony at a sentencing proceeding. The admission of hearsay statements in the sentencing context is subject to the requirements of the Due Process Clause. Under the precedent of this Court, hearsay statements must have some "minimal indicium of reliability beyond mere allegation." [*United States v.*] *Kikumura,* 918 F.2d [1084,] at 1102 [(3d Cir. 1999)] (citations omitted); *see also* U.S.S.G. § 6A1.3(a) (courts may consider any evidence at sentencing "provided that the information has sufficient indicia of reliability to support its probable accuracy").

Id.

Here, the report had been prepared by an expert, Mr. Christopher Briem ("Briem"), in preparation for EB's sentencing. In his report, attached to EB's sentencing memorandum, Briem analyzed the total number of mortgage transactions (508) that ACF, EB's company, participated in and determined that 347 parcels (68%) were either currently owned by the same parties or did not have any recorded deed transfer.  Fifteen properties (3%) showed current owners different from the party to the original loan with transfers between parties showing no record of foreclosure or ownership by a financial institution; sixteen records (3%) were duplicative of other records and were not included in the final calculation of loss; fifty-five parcels (12%) could not be identified in the record provided to the expert; five parcels (1%) were currently owned by financial institutions and therefore no economic loss could be assessed with regard to these properties; and 57 parcels (11%) showed a foreclosure action.  Only the loans associated with the properties which went through foreclosure were included by the expert for purposes of

determining the loss amount. For six of those fifty-seven loans, the price recorded for a sale to a private party exceeded the value of the original loan and therefore the economic loss for these loans was zero. For the remaining fifty-one loans, the expert assumed that the recorded value of the transaction transferring the property was the recouped value of the property. The net difference between the loan amount specified and the recouped value constituted the estimated potential economic loss on the loans secured by those properties. Applying this method, the expert calculated that the economic with respect to the fifty-one loans was $2,406,741. This report was prepared by EB's expert and offered to the court as an exhibit to the EB's sentencing memorandum. The accuracy of the expert's conclusions was agreed upon by the parties. The court found the estimate to be appropriate.

The methodology used by the expert was similar to the methodology used by the government in this case, which this court found to be a reasonable method to determine the loss amount. That methodology used in this case is to add the amounts of the unpaid principal balance (or reasonable estimate thereof) and the lender's foreclosure expenses (unless the judgment value or demand value was used to estimate the unpaid principal balance) and to subtract from that sum the amount of the resale value of the property foreclosed upon. As pointed out by the government, Briem used an even more conservative method than the method found appropriate in this case because Briem did not include foreclosure expenses. In light of the foregoing, the court concludes that Briem's report, Gov't Ex. I, has sufficient indicia of reliability to support its probable accuracy. Accordingly, the estimated amount of the loss resulting from EB's conduct –$2,406,741 – shall be included in the loss amount.

## Conclusion

In light of the foregoing discussion, the losses attributable to VB for purposes of the guidelines include:

| | | |
|---|---|---|
| PNC Losses | $ | 871,669.81 |
| Other Lenders – Foreclosed/resold properties | | 2,735,035.46 |
| Other Lenders – Foreclosed/resold during court Proceedings | | 234,074.00 |
| Other Lenders – Foreclosed/not resold | | 83,257.00 |
| Cowden's Appraisal Fees | | 363,968.00 |
| Losses Resulting from EB's criminal activities | | 2,406,741.00 |
| TOTAL | $ | 6,694,745.27 |

## ORDER

AND NOW, this 26th day of June 2012, upon consideration of the parties' submissions and evidence adduced, the court finds that for purposes of determining defendant Vasilia Berger's guidelines range the loss amount is $6,694,745.27, which results in an 18-level increase to the base offense level.

By the Court:

/s/ JOY FLOWERS CONTI          .
Joy Flowers Conti
United States District Judge